We're asking this court to determine that the state findings of fact are objectively unreasonable. And given the totality of the record before this court, there's no question that we have established by clear and convincing evidence that John Reyes Matamoros is intellectually disabled. I'm using the phrase intellectually disabled because that's now the accepted term. At times I go back and forth and I still haven't gotten it right. But this case tells a story of two people. A troubling story of John Reyes Matamoros from a childhood described as a boy who urinated on himself at 6, who continually put the shoes on the wrong feet, who at 14 But he still did it at 14. At 14, his mother had to go to the bathroom with him to make sure he cleaned himself. She had to dress him. And then we have the troubling story of George Denkowsky, who the state says can't practice forensic... I'm sorry, I have a troublesome story of the victims in this case too, don't I? That's the third part of it, Your Honor. But here we have the question of intellectual disability and whether or not John Reyes Matamoros should be executed. And we have the state of Texas saying that the methodologies and opinions of Dr. Denkowsky are flawed. He's censured by the state of Texas. And yet the state of Texas relies on his opinions, his methodologies, and what he considers important criteria. I thought they'd step back from that. He'd quote them. He'd say they're irrelevant, but they still rely on his opinions. And what's important about his opinions, he says, in adaptive behavior analysis, you look to outside criteria, outside the scope of scientific testing. You can look to TYC records. You look at incarceration. And all of the methodology in accepted science says that that's not permissible. And so you have him, the court saying we're not going to consider his testimony, but as we pointed out in our brief, page after page, finding after finding, they're quoting Denkowsky as a basis for their opinions. And what's important to note. I have a question. Can you use the TYC findings that were testified about, but just have the court use them on its own to say these show someone who's functioning and doing their own analysis, the court doing its own analysis in the adaptive functioning test analysis? Isn't that what it appears might have happened here? That's what they did. Why isn't that acceptable under the way that the Briseno factors work in Texas? Well, Atkins and Briseno specifically say they look to the AMR, which is now the American Association on Intellectual and Disability Development. But at the time Briseno was decided, the AAMR, and it's in footnote 25 in Briseno, defines impairment in adaptive behavior are defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and or social responsibility that are expected for his or her age level and cultural group as determined by clinical assessment. And usually standardized scales. So the definition that the court is adopting looks to clinical assessments by experts. Yeah, but didn't Atkins, I think Hall said that in addition to considering the opinions of medical community, the court can also consider it in its own independent judgment to consider whether a state's execution criterion amounts to cruel and unusual punishment. But within the confines of the definition of intellectual disability. And the definition of intellectual disability that is now in section 591.003 section 15-A requires that a person with intellectual disability means a person determined by a physician or psychologist that have subaverage intellectual functioning with deficit and adaptive behavior. So by definition, Briseno says you have to, in looking at determination of mental retardation or intellectual disability, you must look to the definition of what the doctors say, what psychologists say. You can't, you have to adjust, judge adaptive behavior within the confines of what the science is and how these outside factors, these are outside factors that these scientists should look at. But they aren't controlling. It's the clinical assessment. It's the assessment by experts. But is that true under our precedent? I mean, in Maldonado, for example, they used generalized adaptive functioning information and talked about anecdotal, I mean, not anecdotal, but information about the person when there wasn't expert testimony. And Maldonado is an interesting case, and it's the juxtaposition of Madam Morris because Maldonado contested Denkowski's methodology before the settlement by the board. And once the settlement by the board was reached and Maldonado went back to the state courts and a new hearing without Denkowski was presented, he was granted relief. He was found to be intellectually disabled. Right, but that's by the state court. But I'm talking about our opinion before that happened. It said that we were able to use the information from the observation of the person that was not based upon studies and tests. Well, that's part of it.  But here you have what the state court was doing was saying we're not going to consider the anecdotal stories of Madam Morris' sisters. We're not going to consider the diagnosis of mental retardation by the state when he was 14 or when he was 17. We're not going to consider those facts because we don't trust them. But yet we're going to use things that Denkowski says are important for the consideration of adaptive behavior. But are they saying they're using them because Denkowski said they were important? Yes. But I just think they're saying they're using these factors. And so I'm going to ask the state if they can get to the methodology without Denkowski because I'm concerned of whether the court can on its own say this is the proper methodology. But can the court on its own just say these are the records from TYC, this is the testimony from the case where he answered questions, and therefore we say that he didn't establish that he had these adaptive functioning in at least two areas. You look at what the state is saying about Dr. Smith, onset before age 18. A psychologist for juvenile probation conducts a psychological examination that is consistent with the norms in 1977 and says John Reyes Matamoros is mentally retarded based upon his professional judgment. And he discusses characteristics of adaptive behavior that are in his report. And he talks about being gullible. He's not being a leader, susceptible to influence by other people. He talks about all the characteristics that are consistent with the observations of his sisters. He saw John Matamoros as he lived in society. And Dr. Smith wrote a report and he was labeled by the state of Texas to be mentally retarded. That carried through all of the juvenile proceedings that he was mildly mentally retarded. But was he treated in the TYC like he was mentally retarded? He was diagnosed in TYC by another psychologist being borderline mentally retarded by Dr. Norsworthy. But was he treated as such because the findings here say he was not treated as such and he was treated like a He was in general population given rules to follow. But he still had the diagnosis, consistent diagnosis before the age of 18. Like in Hall, the Supreme Court noted that schoolteachers labeled Hall to be mentally retarded. And that was sufficient for onset before age 18. Here we have not schoolteachers, we have doctors, clinicians saying he's mentally retarded. I don't think anyone's disputing that if this was credited that this would be sufficient. I think what they're saying is the finder of fact did not credit Dr. Smith's report and gave reasons why not. But Dr. Smith's report, if credited, and Dr. Norsworthy would be enough to help with the second and the third factor. And you already have the first factor. Well, but the reason why he's not credited comes from Dr. Denkowski's analysis. He's the one that says Texas Health and Safety Code defined adaptive behavior to mean the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of a person's age and cultural group. Now, if you've got evidence of facts that make up that definition based on testimony and other evidence, why do you have to filter that through an expert for a court to decide that? As the Supreme Court said in Hall, you look to the experts for clarification of what this means. You look to standardized scales testing to see how they fit in. Adaptive behavior is not a test of strengths, rather it's a test of limitations. And you look to see an analysis of those limitations on standardized scales. And once you find that standardized scales, you may have a person in a confinement that says he can stand in line, go to where he's supposed to be, but he can't do the same thing. He can't follow orders and instructions in society. And that's why you have to look to what's happening in society in defining intellectual disability. In fact, in the latest version of the manual written in 2011 or 12 by the American Association on Intellectual and Disabilities Development, they specifically say you aren't to look to how people act incarcerated as a means of determining what is adaptive behavior. While the industry or the doctors may believe that, that's not the standard that Texas has to adhere to, is it? The Court of Criminal Appeals said this is a factor that can be taken into consideration. It can't be the controlling factor when you have the testing that was done by two experts in this case. On the Vineland, you had significant deficits in communication skills, social skills, and daily living skills. And as Dr. Oakland, as he interpreted the raw data on the Abbott's, he said that there were four areas, functional academics, health and safety, self-direction, and social skills, where on the raw data, those test scores show deficits in adaptive behavior that are consistent with the observation of his sisters and consistent with the observations of his siblings. So I agree with you that there is that in the record, and there's been some discounting of some of the experts of how the test was done, but regardless of that, even if you're correct that these other doctors' tests establish completely the case that you're trying to make, the trial court and then the Court of Criminal Appeals did not choose to believe the evidence that way. And we review under a very deferential standard. The problem with the state court findings and the Court of Criminal Appeals finding is that if you take Denkowsky out of the mix, take him out completely, the importance of TYC, as it applies to John Reyes and Matt Morris, would not have an assessment basis by a psychologist. Because that's the key, because Denkowsky, all the findings about TYC and the importance of that behavior come from Denkowsky's opinions. It would have to just be the court looking at the records on its own and drawing these conclusions. Can you tell me whether or not we have a case that says that is okay? I agree with you that the court did look at it from . . . they went through Dr. Denkowsky's testimony and had all the things that were summarized there. But could those things have been observed by the court on its own? And so where you would end up was you would have experts to support your view of the case, but we would have all of this other evidence that a layperson and the court could rely upon under Texas law and the Briseno factors. Judge Elrod, I've puzzled with that same question a lot. And the problem with that analysis is that . . . this may be a poor example. If you take Mein Kampf by Adolf Hitler, and you take the cover off of what . . . and you have just the writers, what he said is just as atrocious without his name, but you put it because it comes from him. That's an extreme example, but what you have is all the opinions and the conclusions that the court is taking is taken from Denkowsky. And their analysis and interpretation of facts are based upon the opinions of Denkowsky. And his methodology is so flawed that what we presented to this court when we filed our petition to stay the proceedings were records from numerous cases where Denkowsky testified. And we showed affidavits and records showing how his opinions and methodologies were so flawed. He is specifically mentioned as . . . by the industry, by his peers, as saying he cannot be . . . his methodology is so flawed that he said don't rely on him by name. He's a Ph.D. in psychology. He's still making a living doing that? He's not chicken farming or anything? He's not doing any mental retardation work anymore. Let me ask you this. You know, in the context of just litigation in general, let's look at this case. I see it . . . or one way you could look at it is the only issue we have is adaptive functioning. And so the petitioner puts on the psychological testimony, and the court can accept that or reject it. I mean, there's no doubt the court has the same . . . make the same credibility call on experts as anything else. So why can't a court say, given the really uncontradicted record here and other evidence that I'm . . . that I credit, this doesn't make sense to me? I think that given all this other evidence, I reject that psychological testimony, and this is what I find. Well, here we had . . . went to the state court with the record from 2006. We brought a . . . two statements from two other experts that said, based upon these records . . . Are you answering Judge Daly? Yes, I am. Can you answer it directly, a little more directly? Yes, Judge Daly. When you have that type of . . . a judge can reject an expert. He can make a finding saying, I reject that expert, and I can . . . and because I find that expert not to be credible. But, if the judge has to hear it and make a determination, if you have one expert and competing evidence, and the cross-examination may be such that the expert is not credible. But, if you have two competing experts, and one expert's methodology is said to be determined by the state licensing board, so flawed he's censured. His opinions are so flawed that he's censured. His opinions can't be given any credence. I'm assuming, and as I understand it, the trial court said Dinkowski's testimony is irrelevant, so in effect we're disregarding that. And that was when the TCCA affirmed primarily on the basis of the trial court's opinion that it accepted that. So, I'm just saying let's just disregard his testimony one way or the other. But when . . . but why can't the court just disbelieve the petitioner's experts and say, I'm going to base my decision on this other evidence I see in the record? Then what are you left in the record? You have Dr. Rosen, Dr. Chiano, Dr. Smith, Dr. Norsworthy, Dr. Oakland, and Dr. Fletcher. That's left, plus the sisters. And you have six psychologists saying John Reyes Matamoros is intellectually disabled. Not one, but six. And the findings of fact don't mention Fletcher or Clinton, or Oakland. They totally disregarded them. As we see in Judge Price's dissenting opinion, he considered them important. In the case where, in Maldonado, where the Novo hearing was held, Maldonado was found to be intellectually disabled. If the state could find one psychologist, one, that would contradict Fletcher or Oakland, they would have brought them. Do you have a case that says that the state must have an expert psychological opinion in order to impose the death penalty? I have Roseno. Roseno says there must be a clinical assessment. The statute says there has to be an assessment by a licensed psychologist or physician. And what statute says that? 591.003, section 15-A. So you have a statute in the Court of Criminal Appeals adoption of the standards of the American Association of Mental Retardation in Roseno. It says— It doesn't apply to all three prongs of the table. All three prongs. And one thing, Judge Davis, that you said was it's not only adaptive behavior in this case. It's also onset before age 18. And the only basis for rejection of Dr. Smith's analysis and his opinion comes from Dinkowski. That's his opinion, and that's what the district court adopted, and that's what the state courts adopted, was Dinkowski's analysis of Dr. Smith's opinions. Oakland, Fletcher, and Roseno all say his opinions are valid. And, in fact, Fletcher and Oakland say that there was no scale testing done available for a doctor to analyze adaptive behavior before 1984. So they had to look at behavior. And the behavior described by Smith is consistent with what his sisters say. So you take the fact findings from the court, and you have to look at what else is there. Take out all the references to Dinkowski's testimony and what's left, and you say what is consistent. TYC records and the testimony at trial are all you're left with. And then you have TYC records where Dr. Oakland and Fletcher say those should not be considered. Right, but the court can consider them if it wants to. But there's then no assessment as required by law, as required by Roseno, as required by statute. And so by clearing convincing evidence, you take it out of the equation. You still have six assessments of intellectual disability. What did Judge Mark Brown do? I realize that he accepted proposed findings. Was there a big hearing? I mean, I know there was no evidentiary hearing. And I know that there's some dispute of whether or not the affidavits that they were attached, did he consider them or not. But how would he go about deciding that he was going to discount Dr. Smith if he didn't hear the testimony? He wasn't Judge Bacon, the prior judge of the 180th. So how did he go about—what's in the record to help us with that? But the problem is, even if I believe that he—if one were to say he didn't go about it very much and just bought the state's findings, if this court of criminal appeals said it was okay and that was a reasonable thing, then we can't look behind it anyway. But what is in the record that he—what he did? Nothing. We were called to court, and he signed the findings in court. Did you each submit findings and he signed their findings? Yes. Did he go through the findings and mark out ones that he didn't like? No. Agree with? As you—if you look on the state—it says states amended proposed findings of fact and conclusions of law. And that's what he signed. And I've been a district judge in Harris County, Texas, and I've signed findings submitted. So I'm not casting aspersions on the court for signing submitted findings. Please don't misunderstand me. But I'm just trying to figure out what was the process by which the judge signed findings when he wasn't the trial judge. May I answer the question? My time's up. Yeah. The finding—we submitted the affidavits, and our objection is to be prior proceedings. We presented proposed findings of fact and conclusions of law. The state countered with its proposed findings, and we were summoned, and he signed them. And that was the process. Thanks. Okay. All righty. You've saved a little time for rebuttal, I believe. Mr. Geisel, we'll hear from you representing the great state of Texas. Thank you, Your Honor. May it please the Court. I'd like to start with one of Judge Elrod's earlier questions to Mr. Schneider about the methodology employed by the CCA, because I think that gets at the heart of the case. Though Mr. Schneider frames this as an attack on the factual reasonableness of the CCA's decision, in truth, it also involves legal challenges to that decision and to the legal reasonableness of what the CCA determined. And once that legal framework is settled, it's going to inevitably follow that the decision is also factually reasonable. And so the legal challenges are that the decision was unscientific, that it failed to follow clinical methods, and that it relied on factors and evidence like Madam Morris's behavior while he was at TYC and TDCJ, and his criminal and maladaptive behavior. But this Court has already rejected those arguments in cases like Chester and Lewis and Maldonado itself. And so when the question is about, well, what's the methodology here, the methodology is Bersenio. And Bersenio put criminal and maladaptive behavior into the analysis, and Bersenio relied on behavior while institutionalized. And there is certainly no clearly established Supreme Court precedent that would prevent a state court from relying on those factors. And that's why this Court has repeatedly used those factors in denying relief. And so the question of expert testimony is solved by Bersenio when it writes, the ultimate issue of whether this person is, in fact, mentally retarded is one for the finder of fact based upon all of the evidence and determinations of credibility. Well, you know, one problem I have with the state's argument is that all these findings, a lot of these findings are fact. I mean, repeatedly through the findings of fact that the trial judge signed, he footnotes Dinkowski's testimony. After he said that it's irrelevant and, in effect, he's going to disregard it. So don't we have to take the state court findings and the basis of those findings the way the Court states them? I mean, can we just say, well, he didn't really rely on Dinkowski? Yes. How can we say that when that's what he's relying on? We certainly, just as an initial matter, we certainly do not dispute that the trial court here in his revised findings continued to cite Dr. Dinkowski. But that point doesn't help, Madam Morris, for three reasons. First, it's the CCA's decision that matters, not the trial court's. Yeah, but, I mean, we're looking at whether these are reasonable or unreasonable findings, and it seems to me we have to look at the basis for the finding. But the CCA stated that it was basing its decision on its own review of the record and not only on the trial court's written findings. And so I think that's actually a notable distinction between this case and Maldonado that actually makes our case even stronger here. But we have to be able to review the record and say that there's something in the record that would support the CCA's position. I mean, it says it was basing on its review. We have to be able to find something in the record that would support the decision made by both the CCA and through the trial court, the determinations that the court made about the TYC records and the testimony at trial. There has to be something to support it. That's exactly right. The way you framed the question about how there has to be something in the record to support the decision was going to be my second response to Judge Davis. And so to get at the heart of the question about, well, what supports the decision and not the written opinion explaining that decision, and that's the punishment phase testimony from Madam Morris' trial, his trial counsel's affidavit, the TYC and TDCJ records, and the cell inventory testimony from death row officers, and some statements from Drs. Rosen, Quijano, and Norsworthy, all of which support the state's view. And all that evidence is fair game without Dr. Dinkowski's testimony because we don't need Dr. Dinkowski to tell us that we can read TYC and TDCJ reports. But can the court do that on its own without having some methodological assistance that says without being told that if you find this, it's indicative of adaptive functioning or it's not, without being told that adaptive behavioral deficits, without being told that, how can you read the records and glean what you're supposed to glean from them? The court can do that, Judge Elrod, and we know that because that's what Briseño puts as the methodology, and we know that because that's what happened in Maldonado. Dr. Dinkowski was the state's expert in Maldonado, and what the court did there, the analysis that this court conducted in Maldonado, is exactly the analysis that we're asking this court to conduct here. Maldonado, didn't they just disregard the test? They didn't disregard his total testimony like here, as I recall. That was what the CCA's decision did. It disregarded the opinion, but the findings there weren't structured to insulate themselves from Dr. Dinkowski's criticism of other testimony. But when this court examined the record, this court disregarded Dr. Dinkowski's testimony on the whole. And so Maldonado is one example. Another is in United States v. Webster, where the defense placed into record the results of a Vineland test, and this court noted that direct evidence of an adaptive deficit rebutted that Vineland report. In both those cases, there was no expert testimony rejecting the finding of retardation? In Maldonado, there was only Dr. Dinkowski. In Webster, I believe there were government witnesses, but the key part of the opinion is noting that direct evidence in lay testimony can rebut expert testimony. And again, we know that because of decisions like Chester and Lewis, which state that the methodology doesn't have to track clinical methods. It's a stronger case, though, than Maldonado, because there are all these experts lining up on the other side. There was an expert in Maldonado as well. There are all these experts lining up on the other side. With respect to my friend in opposition, I think he's overstating the case that was made by those experts because there are substantial problems with all of their opinions that don't rest, again, on Dr. Dinkowski's testimony. What is the record supports the court's discounting or not considering Dr. Smith's report and Dr. Norsworthy's report, both of which are crucial because they're before 18 and dealing with adaptive deficits? I'll start with Dr. Norsworthy because it's a shorter answer. Dr. Rosen herself stated that Dr. Norsworthy didn't conduct any adaptive behavior assessment, and that's at page 128 of volume 2 of the reporter's record. And so that's relying on Madam Morris's own expert to show that there was no adaptive behavior assessment, and that's, of course, the prong that's at issue here. We aren't disputing the first prong. And now, as to Dr. Smith, there are two main problems with his report. First is, as the federal district court here explained, Dr. Smith's report didn't specifically address adaptive behaviors. Why is that even relevant, what the federal district . . . I mean, we often read and rely on federal district courts, and they're wonderful, but how is that relevant, how the federal district court read it? That's not relevant to how . . . I thought that was a very odd thing to have in the findings. It was almost because there was nothing that you could put in there except the federal district court, so there was this reaching out to the federal district court. So, all of a sudden, just kind of out of the blue, what besides the federal district court would support this? We need to go outside the federal district court. Certainly. Dr. Rosen's testimony herself. She stated that no full adaptive behavior assessment was conducted. She merely assumed that Dr. Smith analyzed adaptive behaviors, what she called informally, based on some of his discussion of Madam Morris's personality traits. But she also admitted that personality testing isn't the same thing as an adaptive behavior assessment. So she merely speculated that Dr. Smith took into account adaptive behaviors because he reached an end result diagnosis. But she didn't talk to Dr. Smith. She doesn't know Dr. Smith. All she has is that report. And so the state court . . . It can't be clearly erroneous for the state court not to credit Dr. Rosen's speculation about what Dr. Smith . . . what kind of analysis Dr. Smith performed. And while Dr. Oakland said the same thing, adaptive behavior never was assessed properly. And the second problem with Dr. Smith's report is that even if you credit that personality assessment as being an adaptive behavior assessment of some kind, his specific conclusions were rebutted by other evidence in the record. He called Madam Morris socially inept, simplistic, and easily led. But there were other reports of Madam Morris being manipulative and having good leadership potential, and numerous reports of his good social skills. And there's also Madam Morris's own testimony where he explained that he refused to do some of the more violent deeds that the Mexican mafia encouraged him or asked him to do. And so where you have that conflicting evidence, that's exactly what happened in Webster, where direct evidence rebutted findings from an expert. And even crediting all that speculation on Dr. Rosen's part, even Dr. Rosen stated that she would accept Dr. Smith's report as only a bit of evidence in favor of Madam Morris's position. And so if that report, even taking everything Dr. Rosen said to be true, can only be a bit of evidence, that cannot be the basis for granting relief under AEDPA. What do you do with your opposition's comment that the Court of Criminal Appeals is not following its own Brasenio factors based upon this in the statute that say that you should have a clinical assessment? Well, in the first place, I'm not aware of Brasenio citing that specific part of the statute. But even so, nothing in Brasenio says that you need expert testimony and, indeed, that's why Brasenio says that quotation that I read earlier in my presentation, where it says the decision is in the hands of the fact finder. If it was going to make expert testimony conclusive somehow or make it so the fact finder had to defer, it would have said that. And so while we acknowledge, again, that the trial court cited Dr. Dinkowski, it's the CCA's decision that matters. This court has to evaluate the state court decision, not the opinion explaining that decision. You know, in an area like this, ordinarily the fact finder's role is to assess the competing opinions. I mean, it's not in the absence of any opinion that supports the conclusion it reaches to go off and find facts without an opinion to support its conclusion. I mean, it's odd to me that you'd have a finding like this, a technical, psychological finding of intellectual disability or retardation without an opinion to back it up. Your knowledge of different areas of the law vastly exceeds mine, so I won't pretend to say whether this is unusual or not, but I know this is also what happened in the Supreme Court's decision in Parker v. Matthews, which we cite in our case, where it said that the jury could find its own sense of what happened contradicts an expert's opinion. I mean, in the context of retardation? No, no, no. Sorry. I was trying to— What about in the context of retardation? I mean, you cited Mel— did Mel Donato have an opinion that supported a finding of retardation? Only Dr. Dinkowski's. And that was disregarded? And again, the court disregarded Dr. Dinkowski's. That's why that analysis is not only mandated by AEDPA, but also directs the root here, because disregarding Dr. Dinkowski's testimony, the CCA's decision there was reasonable, and so, too, is the decision here because of all the evidence that we know the court, as fact finder under Briseño, can take into account. Did the court really take anything into account here? The court hadn't heard any of the witnesses and are we— I mean, it may not matter at our level of review, but can we have any confidence that the court actually made these findings after agonizing over whether Dr. Rosen was credible or not and all of that sort of thing? Do we have any confidence of that whatsoever? Yes, Judge Elroy, because the state court is just as concerned as this court about getting to the right result. No, but I mean, he didn't hear Dr. Rosen and he didn't hear any of these doctors at all. And then he relied on Dr. Dinkowski even though he said he wasn't. So I'm a little bit concerned that there's maybe no there there. Did the district court actually go through and say, I've looked at these TYC records and on my own I can determine that the Briseno factors are met or not met here? It doesn't really seem like much was done. Maybe there was more done than what your opposing counsel says. Well, the CCA expressly stated that it did. And that's what we should look at. That's what you have to look at under AEDPA. And I recognize that we're asking a lot of the petitioner that it's a difficult standard to meet. But in the Supreme Court's words, if it seems like a difficult standard, that's because it was meant to be a difficult standard. So you have at least four or six, you either have four experts or six experts that, some of them have problems in their testimony, go against you. And then you've got on your side the records and the trial testimony. Is that it? And the law. And the law. Yeah, the law that you defer. We have the law. And the reason the law is so important is because it lets us look at not just Madam Morris's trial testimony, but reams of TYC and TDCJ reports from when he was 14 all through the hearing. And how do we go about... What's the critical age that the petitioner must be mentally retarded before he gets relief? That's the third prong. There has to be onset before the age of 18. Before the age of 18. All of this lay testimony was not before the age of 18, was it? It's both. It starts with... What do we have? I know we've got Dr. Smith's testimony regarding his examination before age 18. We have some TYC records. Is there anything else before the age of 18? Before 18, I believe it's just the TYC reports and Dr. Smith's report. Dr. Norsworthy's report was 1980, I believe, but I'm forgetting when he was born. Well, isn't that what we have to look at is the evidence before the age of 18? Just for the third prong. And again, the burden would be on Madam Morris. So even if he could show, even if he showed there was onset before the age of 18, he has to show that carried through after 18. I think that's the second prong. But I do want to return to this issue of the experts because even if it were appropriate to just count up the number of experts on their side, we've already addressed Dr. Smith and Dr. Norsworthy. And again, Dr. Norsworthy, I don't think she'd count at all because she didn't conduct any adaptive behavior assessment. The same applies for Dr. Quijano. And to the extent that Dr. Quijano's report is relevant, he actually supports the state's view, called Madam Morris well-groomed, well-oriented, able to conduct a reasonable conversation. And that's exactly what is revealed by other reports. And then as to Dr. Oakland and Dr. Fletcher, even if Madam Morris could overcome the Cullen v. Pinholster problem so that this court could rely on those affidavits even though he didn't properly present them to the state courts, those affidavits don't help them because all they do is attack Briseño. How did he not properly present them? The Court of Criminal Appeals said you could submit... The district court, if it chose, could consider affidavits. They submitted affidavits so that the Court of Criminal Appeals could... I mean, the district court could consider them. And at least the dissenters on the Court of Criminal Appeals relied on those affidavits in their opinion. So how do we know that those weren't considered? The CCA gave the state trial court discretion to order affidavits. The court could order affidavits, or the CCA also said that the trial court can simply re-adopt its findings. Right, but did the district court say, no, I'm excluding your affidavits? No, but in the absence of either permission or some kind of procedural law that would allow it, as this court knows, petitioners and litigants can't just throw evidence at the court and demand that it be heard. What do we do with the fact that at least some members of the CCA relied upon it in their opinion writing? I think that gets at the substance of the affidavits, which is about where I was going to get to anyhow, because all those affidavits do is attack the substance of Briseño. They say that the CCA's decision wasn't scientific, and they specifically complain that the CCA relied on criminal maladaptive behavior and Madam Morris' behavior while at TYC and TDCJ. But that's a pinholster problem if the court itself is relying on the affidavits to do its analysis. No. That would be if we had the federal district court go do a hearing and considering evidence, or we did it on our own or something. If the CCA wants to consider affidavits, then we have to review the CCA, don't we? Yes, but there's no indication that the CCA majority, which is, of course, the basis of the decision, reviewed those affidavits. But if the majority say the dissent is wrong to cite these affidavits because they are not in the record before us. No, it doesn't, but there's no indication that they did consider them. But if the court thinks that it's a difficult decision on the Cullen v. Pinholster issue, then I still don't think it matters because all those affidavits do is attack Briseño. Has a Cullen v. Pinholster ever been applied to documents, affidavits that are before a court of criminal appeals as opposed to documents that are by the federal court on its own? Well, the key part isn't that it was before the court of criminal appeals. It's that it wasn't properly before the state court. But does Cullen v. Pinholster allow that type of analysis where if the court has it, that we're going to look into whether that was proper or instead of whether it's in our court only? What case do you cite for this use of Cullen v. Pinholster? That's Cullen v. Pinholster. No, but where it would be in this circumstance where they had the documents and some of them looked at it and some of them may not have, but it's not the federal court going in and doing its own hearing. I don't have anything specifically on that. I'm happy to update the Coordinate 28J letter if it wishes. But the point of those affidavits was just to attack Briseño. And so if the CCA wasn't going to revisit Briseño, there was no point in discussing them. And so I think that might be why the CCA didn't discuss those affidavits. So in sum, the best thing that Matt Amoros can say for his claim is that there is some evidence that supports his view. And I think much of that evidence is seriously flawed, as I've explained with his experts in particular. But even if he has some evidence in support of his view where there's conflicting evidence before the state court and the burden was on the petitioner before the state court and the burden is on the petitioner in this court not only to show that the state court's decision was wrong but objectively unreasonable, EDPA requires that relief be denied. Are the decisions from the other circuits that have affirmed a death penalty when there was no expert testimony by the state? I'm not aware of decisions in other circuits either way. I know, again, that there are decisions in this circuit like Maldonado. And so we do think that the analysis in Maldonado directs the proper outcome here. What happens if the TYC records actually show some evidence of adaptive behavioral deficits, such as immaturity, et cetera, that there are some... you can read the records to find that? Is that just a matter of... we defer to that court's reading of the records? Well, we do agree that there are some isolated statements in the TYC records. I think one of them was about Matamoros' immaturity. But where there's conflicting evidence, it's in the hands of the fact finder. And that's what the best thing Matamoros could say for himself here. And we discussed in detail all the TYC reports, the TDCJ reports, Matamoros' own trial testimony, and all of that points to the same place. And in that kind of situation, AEDPA controls what can happen. Do you want to address... it seems that Paul is moving towards reliance on professionals with these difficult questions about whatever the proper term is for mental retardation that we're supposed to use now. Intellectual disability. Thank you. I apologize. Hall appears to be moving that way, and the dissent goes on at length that they don't like or they don't believe it's appropriate for Hall to be moving that way. This is kind of cutting against the grain of Hall. That could be a fair characterization of Hall, but this court has already addressed how Hall impacts Briseno. I have a question about that. I thought that you might rely upon the case, the Mays case. But Mays says, using additional information, and this isn't additional. This is only. So I'm not sure that Mays directly answers the question here. You see what I'm asking about how the language from Mays that you cite, and it says additional information can be used, like the Briseno factors, but that's additional non-diagnostic factors. I thought the idea behind that was addressing Hall's decision, which was very focused on a strict intellectual cutoff. And so I thought Mays was saying that Texas doesn't do that. It makes this a more holistic, subjective assessment. But second response is that the point of Mays is that it holds that Hall in no way affects Briseno. And third, even if Mays doesn't address the question here, there's still no clearly established Supreme Court precedent at the time that the CCA rendered its decision that would prevent a state court from relying on the factors that we've discussed at length now and from relying on direct evidence. And we know that because there's nothing in Atkins, and we know that because this court has repeatedly used those factors to deny relief. And I'm sure this court is following, of course, clearly established Supreme Court precedent. Would it be unusual, though, even in Texas, to execute someone that has below 70s for all of their tests, including the one that Dr. Dinkowski took before it was ratcheted up using his other methodology? I'm not sure about the state's history, unfortunately, but mental retardation or intellectual disability involves, of course, three prongs. And we're focused here on the second and third prongs, and that's... Should you take offense to Judge Elrod's question, even in Texas? Perhaps I'm tongue-in-cheek, and I don't certainly mean to besmirch the great state of Texas, which I am very fond of. Texas follows the law, and as I said before, the CCA is just as concerned with this court as getting to a right decision, just that its opinion-writing practices are influenced by other factors. And so when it says that it based its decision on the record, I respectfully submit that this court should take that at face value, especially in light of AEDPA and the analysis that AEDPA commands. And I've gotten myself in trouble now. I want to make sure when I say I'm very fond of the state of Texas, I don't mean the state of Texas as a litigant in this lawsuit, and I believe that the appellants are aware and the petitioners are aware of it. I don't mean it in that sort of way at all. I only mean it in the abstract place that... So, thank you. We're going to let you. The court has no further questions. We ask that you support your argument. Thank you. And Mr. Gautreaux. We'll hear from you. Give us your take on Mel Donato at some point. Sir? Give us your take on Mel Donato and why it doesn't control this case. Yes, sir, certainly. I have one point on rebuttal, and that is the fact that the Texas legislature hasn't spoken specifically as to the substantive and procedural process for dealing with Atkins claims. And so what we are left with is the CCA's opinion in Persenio. That opinion refers to two sources, two definitions for defining mental retardation. That is, Texas statutes, the Texas Health and Safety Code, which defines mental retardation as a diagnosis by a doctor or a licensed clinician. And so, Judge Elrod, when you spoke earlier about having concerns about the methodology that's employed in making these types of determinations, that's a legitimate concern. I mean, the reason that we allow expert testimony is to inform the fact finder. If that testimony is going to help the fact finder make... Not to make the fact finder's decision. Correct, Your Honor, correct. But to inform the fact finder, to help them digest this information and understand what weight to assign to certain characteristics. And in this case, if we remove Dr. Dinkowski's findings of fact and all of his characterizations of those historical facts, what's left? I mean, I'm just repeating what other judges here have said. Do we have to rely on experts to tell us how common sense applies to a case? I just... No, Your Honor, I don't believe any court should have to rely on or any fact finder. They step way, way over the... Well, that's another question. Go ahead. I don't believe that any fact finder should have to rely on an expert for something that's commonsensical. Is the issue of intellectual disability common sense? I can say that I've certainly learned a whole lot about what goes on into making that kind of determination, that there are specific diagnostic tools for particular populations based on their age, based on their education, based on cultural phenomena, and that that tool has to be applied, administered in a very particularized way. Why can't a judge just hear that testimony without an expert, hear the evidence, and make up his own mind about it? Well, with all due respect, Judge Jolly, I would think that when it comes to an issue like intellectual disability and specifically whether or not... Well, I mean, intellectual disability gets... You know, why it gets so technical and refined? Because experts, you know, like lawyers, historically have been accused, they make it so... They obfuscate it so that you have to have a lawyer to figure out what the obfuscation is that they created. Yeah, I think we call that job security. Same thing with these people. I hear what you're saying, Your Honor. I know if somebody is, you know, 18 years old, doesn't take a bath, doesn't do anything, he's got a low IQ and can't take care of himself, I mean, I know the guy's intellectually disabled. I mean, I ain't got to have an expert to tell me that. It seems to me. Well, Your Honor, in this case, in the case that is before the court, we are working under a Texas scheme, under Presenio and under our statutes, specifically the Health and Safety Code. And if there are experts that have performed tests, that have subjected those tests to peer review by folks that are smarter than them, and if you stack up all these years of research, Your Honor, it would seem to me that a fact finder would want to be informed by those folks that have spent the last 40 years studying this subject. How is a judge informed? If one tells you this, the other tells you that, both of them have credentials in telling you the opposite things. Well, Judge, I'll tell you what, that if we had an expert, a controverting expert, we wouldn't be here today. But we don't have competing experts. Whoa, whoa, whoa. Don't say that. I don't go that far. We don't have competing experts. We've got six all saying that Mr. Matamoros is intellectually disabled. I know you, I mean, I understand the case. But there's no one on the other side. If there were, were the trial court free to ignore these six and believe this one? Perhaps. Well, you know, there's no doubt certain issues require expert testimony. Yes, sir. On both sides. And the question is whether this one does, the adaptive function, whether that requires an expert. And did Maldonado, was there any expert testimony that helped in that case? I believe that there was, Your Honor, that they were dealing with a circumstance of competing experts. Well, the opposing counsel says no, said all they had was Dinkowski there, and he was disregarded. Is that your understanding of the case? My recollection of the case, Your Honor, is that there were independent sources for the historical facts, that the court, the fact finder wasn't relying specifically on Dinkowski's characterization of those historical facts. And in that particular instance, I mean, you and I can both look at this podium and say it's a brown podium. That's an objective truth. But when you take someone like Dinkowski, and the podium's not here, and you're left with just what his presentation to the fact finder is, then the fact finder's stuck with that presentation. Well, they had more than that now. I mean, they had, you know, the fact that he's able to concoct a story and defend it at the trial and the testimony while he was incarcerated. They did have that. Well, Your Honor, but the significance of those phenomena is colored through Dinkowski's lenses. He has weighted those items more heavily than what every other professional has told us they deserve to be weighted. And it is that reason that he's no longer allowed to even practice forensic psychology on Atkins claims in Texas. I see that my time has concluded. Thank you very much. You've been helpful. Thank you. I appreciate your co-counsel. We have the case in hand.